### INTERNATIONAL HARVESTER CO. v. NATIONAL SURETY CO.*

No. 36043.

District Court, N. D. Illinois, E. D.

Sept. 27, 1929.

Wilson, McIlvaine, Hale & Templeton, of Chicago, Ill., for plaintiff.

Winston, Strawn & Shaw, of Chicago, Ill., for defendant.

*Jdugment reversed 41 F.(2d)——.

WILKERSON, District Judge.

This suit is brought to recover $80,421.47, loss claimed to have been sustained under a burglary policy of insurance.

The insuring clause is as follows: "For direct loss by robbery of money, intended for pay rolls only, from the care or custody of any employee of the Assured, while acting as Messenger or Paymaster, and while receiving, handling, conveying and distributing the same, to and from and within such place or places as may be directed by the Assured and described in Statement No. 3 of the Schedule."

The policy defines "robbery":

"Robbery, within the meaning of the policy is limited to a felonious and forcible taking of property:

"A. By violence inflicted upon the person or persons in the actual care and custody of the property at the time, or

"B. By putting such person or persons in fear of violence, or

"C. By an overt felonious act committed in the presence of such person or persons and of which they were actually cognizant at the time, or

"D. From the person or direct care and custody of a custodian, who while conveying property insured under this policy, has been killed or rendered unconscious by injuries inflicted maliciously or sustained accidentally.

"E. Premises as referred to in this contract shall mean the entire property of the Assured at the various locations named in the policy including intersecting streets not beyond outside boundary of such property."

Under the heading "Special Agreements" are the following:

"A. The company shall not be liable for any loss: (1) Unless effected between the hours between 7 A. M. and 7 P. M. * * *

"D. The hours of coverage as described in the policy shall refer to the hazard existing outside of the premises of the Assured and it is made a part of this Contract, that the hours of coverage on all pay roll money on the premises of the Assured are extended to cover from 6 A. M. to 10 P. M."

Under the heading, "Location where money is paid to employees and the number of guards accompanying each paymaster and location and kind of conveyance used and other form of protection," is the following:

" * * * Guards Private Conveyance Other Protection

"22. Tractor Works, Chicago, Ill. 2 Yes * * *"

As to two of the other plants provision is made for a "safe" for other protection.

The policy further provides:

"Number of paymasters not to exceed thirty-two (32) but there may be as many assistant paymasters, as are required and the personnel of the paymaster at any place, or any of his assistants is entirely eliminated.

"It shall not be a breach of warranty to dismiss any and all guards used in the conveyance of said pay roll moneys, after the paymasters shall have entered the premises of the Assured."

On March 5, 1926, money, intended for pay rolls only, was transported by Brink's Express from plaintiff's main office to the Tractor Works. It was in a box 3 feet long, 2½ feet high, and 18 inches broad, weighing about 175 pounds. It was removed from the express wagon and carried by the express-men into a room known as the conference room and placed on the floor in the northwest corner of the room. This room was one of a series along the south front of the building. They were separated by partitions of which the lower 3½ feet were solid wood and the remaining portions glass. The rooms in their order from west to east were the office of the superintendent, the office of the assistant superintendent, the conference room, and the office of the cashier. Then came the vestibule, on the other side of which were additional rooms. Johnson, the cashier, gave a receipt for the box, Brink's messengers and guards went away and the door to the conference room was locked. No one remained in the conference room. It appears that no one was in the office of either the assistant superintendent or the cashier. Waring, the assistant superintendent, and Lutz, the superintendent, were in the superintendent's office. There were watchmen and other employees in different parts of the building. Wrath, the regular paymaster, was not in the building. It is not claimed that any employee, with the exception of Lutz, the superintendent, was charged with the care and custody of the box, as paymaster or messenger, after it had been placed in the conference room.

About thirty minutes after the box was placed in the conference room, a group of robbers invaded the premises, covered Lutz, the watchmen, and other employees with revolvers, fired shots, broke the glass partition of the conference room, and carried away the box.

This question must be answered: Was there a robbery, within the meaning of the policy, from the care or custody of Lutz, while he was acting as messenger or paymaster, and while he was receiving, handling, conveying, or distributing the money? And in answering the question consideration must be given to the definition of "robbery" in the policy, by which the violence, threats, or felonious acts must be directed against or committed in the presence of the person or persons in the actual care and custody of the property.

Plaintiff stresses the rule that contracts of insurance should be liberally construed to accomplish the purpose for which they are made, and that the language of the policy must be interpreted with reference to its general purpose and its particular subject-matter. The object of the policy, it is said, should not be defeated by any narrow interpretation of its provisions, nor by adopting a construction favorable to the company if there be another construction equally admissible under the terms of the policy. The rule, however, does not permit the court to make contracts for the parties or to take away from plain and unambiguous terms their obvious meaning.

It is urged that, inasmuch as defendant for a long time had followed the practice of leaving the pay roll box in this conference room in the manner in which it was left on March 5, 1926, the policy must be construed as having been written with that practice in mind and held to cover the entire period of the pay roll operations, including the time when the box was "at rest."

The language of the policy seems clear. Accepting the contention that it was written with the specific pay roll operation at this plant (which was one out of thirty-two) in mind, its provisions negative the idea that it was intended to cover any part of a pay roll operation when the money was not in the actual care and custody of a messenger or paymaster. It might be contended with just as much force that the policy was framed so as to relieve the defendant from liability whenever the plaintiff saw fit to give to the pay roll a measure of protection different from that specifically set forth. To leave the box week after week in an empty room, without any appearance of guarding it, except the presence of the superintendent at his desk in a room which was not even adjacent to that in which the box was left, was something against which the defendant might well wish to protect itself. Such a course was the very

958

thing which would suggest to criminal minds the possibility of success in carrying out the plan to rob shown in this case.

Plaintiff argues with great emphasis that the presence of Lutz in his office was a compliance with the provisions of the policy, and here the arrangement between Lutz and Wrath, the paymaster, that on pay roll days Lutz was to remain in his office until Wrath had returned is stressed. The record has been examined carefully on this point. Viewing the evidence as favorably as possible to the insured, the court is unable to find that the pay roll money, at the time of the robbery, was in the actual care and custody of Lutz while he was acting as messenger or paymaster and while he was receiving, handling, conveying, or distributing the same. In fact, the word "care" may not properly be applied to the relation of Lutz to this money. There was no act on the part of Lutz which would give, even remotely, the impression that he was doing anything to look after the box or that he was protecting it. The box was brought into the room. The messengers and guards and the man who receipted for it went away. They had no communication with Lutz. The custody of Lutz was purely subjective. It cannot be described as *actual*. Nor was he *acting* as messenger or paymaster or in any other capacity with reference to the pay roll box.

The evidence in this case, in the opinion of the court, requires a finding for the defendant. In the view which the court takes of this case, the requests for special findings must be denied.